**Donald Robert WOODMAN; Yvonne E. Woodman; Scott Forrest Woodman; Candra Dawn Woodman; and Steven Dwight Woodman, Plaintiffs,**

v.

**UNITED STATES of America; Waste Control of Florida, Inc.; Waste Management, Inc.; and Refuse Services, Inc.,[1] Defendants.**

No. 87–116–Civ–J–14.

United States District Court,
M.D. Florida,
Jacksonville Division.

May 21, 1991.

---

1. Throughout this Order, defendants Waste Control of Florida, Inc., Waste Management, Inc., and Refuse Services, Inc., will be referred to as the "Waste Haulers."

Harold S. Lippes and Terrance E. Schmidt, Bledsoe, Schmidt, Lippes & Adams, P.A., Jacksonville, Fla., Merrill G. Davidoff and Steven H. Doto, Berger & Montague, Philadelphia, Pa., Erwin A. Sherman and John Osborne, Sherman and Osborne, Louisville, Ky., Ronald Simon, Connerton, Ray & Simon, Washington, D.C., for plaintiffs.

S. Michael Scadron, U.S. Dept. of Justice, Washington, D.C., for defendant U.S.

John A. DeVault, III and Michael D. Whalen, Bedell, Dittmar, DeVault & Pillans, P.A., Jacksonville, Fla., for defendants Waste Control of Florida, Inc., Waste Management, Inc. and Refuse Services, Inc.

## ORDER AND JUDGMENT

SUSAN H. BLACK, Chief Judge.

This case is before the Court on the Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co–Defendants' Cross–Claims, filed on February 4, 1991. On March 5, 1991, the Waste Haulers filed a response in opposition. Also pending is Plaintiffs' Cross–Motion for Summary Judgment Against Defendant United States for Order That the Discretionary Function Exception to the Federal Tort Claims Act is Inapplicable to This Case, filed on February 25, 1991. The Government filed a response in opposition on March 5, 1991. The Court heard oral argument on these motions on March 19, 1991.

## I. FACTUAL BACKGROUND

The crux of the pending motions for summary judgment involves how waste generated by two Naval air bases, Naval Air Station Jacksonville [hereinafter "N.A.S. Jacksonville"] and Naval Air Station Cecil Field [hereinafter "N.A.S. Cecil Field"], in Jacksonville, Florida, was handled and disposed of during 1968 through 1970. In order to address the merits of these motions, the Court must first review the history of waste disposal on the bases.

Throughout the 1960s, N.A.S. Jacksonville and N.A.S. Cecil Field had a combined population of about 7,600 personnel. In addition to the solid and liquid waste typically associated with a residential community, the bases also generated industrial waste as a result of the repair and maintenance of Naval aircraft and weaponry which was conducted on the bases. Prior to 1964, each base's public works department, using Navy labor and equipment, was responsible for disposing of the solid waste.[2]

In 1964, N.A.S. Jacksonville, and in 1966, N.A.S. Cecil Field, made the decision to hire private contractors to dispose of its waste off-base. The reasons for this decision were as follows. First, during the mid–1960s, the Navy developed a policy of contracting work to local businesses in order to contribute to the economies of the communities in which naval facilities were located. Secondly, smoke from the burning garbage interfered with base aviation and caused the bases' neighbors to complain. Lastly, the bases were running out of available disposal sites, and contracting out refuse collection and disposal services was more cost effective than purchasing additional land for new landfills. As a result of this decision, the Navy awarded the waste disposal contracts to Waste Control of Florida, Inc. [hereinafter "Waste Control"].

Among the landfills which Waste Control owned and operated was the Hipps Road Landfill [hereinafter "Landfill"]. This landfill opened either in April or July of 1968, and occupied approximately seven acres in what was once a cyprus swamp. Waste Control disposed of the waste it collected from N.A.S. Jacksonville and N.A.S. Cecil Field at this landfill. Waste Control ceased utilizing the Landfill in late 1969 or early 1970 when the landfill's capacity was reached.

In March through May of 1983, more than thirteen years after operations at the Landfill had ceased, groundwater testing of property at and near the Landfill revealed contamination. These tests showed the presence of volatile organic compounds in some of the private wells. In September of 1983, as a result of the groundwater contamination, the Landfill was placed on the Environmental Protection Agency's National Priorities List. On November 7, 1983, the City of Jacksonville declared a water pollution emergency and provided residents with bottled water until the City of Jacksonville's water system could be extended to the Hipps Road Landfill area. In 1989, Waste Control bought several of the contaminated properties, including the Woodman's property, and entered into a well abandonment program before capping the Landfill.

## II. THE COMPLAINT

On September 5, 1989, the plaintiffs filed a Second Amended Complaint alleging eight causes of action.[3] Donald and Yvonne Woodman owned property located at 9804 Hipps Road, Jacksonville, Florida.[4]

---

**2.** Employees of the Maintenance and Transportation Branches of the Public Works Department collected garbage from the dumpsters around the base and dumped it in the on-base landfill. The Utilities Branch of the Public Works Department maintained and operated the sewer system and sewage treatment plants.

**3.** This action was originally filed on February 17, 1987. On September 5, 1989, a Second Amended Complaint was filed, which named 172 plaintiffs. On August 13, 1990, the Court decided that the case was unwieldy and ordered the action divided by families, with each family being assigned a new case number. The Woodman case is scheduled as the first of the fifty-three families to proceed to trial.

**4.** The other three plaintiffs in this action are the Woodman's children.

They allege that as a result of the defendants' actions, the water, air, soil, septic system, property, and home of Donald and Yvonne Woodman have been contaminated, irreparably damaged, and reduced in value. Second Amended Complaint at 36, ¶ 50, filed on September 5, 1989. They further allege that they have each suffered mental and physical injuries, both temporary and permanent. *Id.*

The plaintiffs allege that the Court has subject matter jurisdiction over the proceeding against the Government pursuant to 28 U.S.C. § 1346(b) since the plaintiffs' claims against the Government are pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 [hereinafter "FTCA"]. As to the Waste Haulers, the plaintiffs allege that the Court has pendant jurisdiction.

Counts One and Two allege causes of action for negligence for the Government and the Waste Haulers' alleged failure to exercise due care in the use, control, and disposal of ultra-hazardous chemicals. As a result of this alleged failure, the plaintiffs contend that they were unreasonably exposed to the ultra-hazardous chemicals. Count One is against the Government, while Count Two is against the Waste Haulers.

Count Three alleges a cause of action for trespass against the Waste Haulers for their alleged failure to control and properly dispose of the ultra-hazardous chemicals. As a result of this alleged failure, the plaintiffs contend that a tangible invasion upon their land occurred, causing an actual interference with their possessory interest in their land.

Count Four alleges a cause of action for nuisance against the Waste Haulers for their alleged failure to control and properly dispose of the ultra-hazardous chemicals. The plaintiffs contend that this alleged failure constituted an unreasonable interference with their use and enjoyment of their land, thereby creating a private nuisance.

Count Five alleges that the Waste Haulers' use, control, and disposal of the chemicals constituted an abnormally dangerous and ultra-hazardous activity. Therefore, the plaintiffs contend that the Waste Haulers are strictly liable for their personal injuries and damages.

Count Six alleges a cause of action for failure to warn, notify, and aid the plaintiffs concerning the necessary steps to protect their health and property. The plaintiffs contend that the Waste Haulers knew of the dangers of the ultrahazardous chemicals of which they disposed, yet continued to dispose of them without proper care. The plaintiffs contend that the Waste Haulers attempted to conceal the improper disposal of these chemicals from the plaintiffs.

Counts Seven and Eight allege a cause of action for reimbursement of response costs pursuant to § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. The plaintiffs allege that as a result of the release of the hazardous substances into and from the Hipps Road Landfill, they have incurred and will continue to incur costs in response to the release of these hazardous substances, including but not limited to costs of obtaining medical surveillance and an alternative water supply. Count Seven is against the Waste Haulers, while Count Eight is against the Government.

On October 5, 1989, the Waste Haulers filed a two-count cross-claim against the Government. Answer to Second Amended Complaint[,] Affirmative Defenses[,] and Cross–Claims of Defendants Waste Control of Florida, Inc., Waste Management, Inc., and Refuse Services, Inc., filed on October 5, 1989. Count I is an action for indemnity and Count II is action for contribution.

On April 24, 1991, the Government responded to the Waste Haulers' cross-claim and filed a four-count cross-claim of its own against the Waste Haulers.[5] Amend-

---

5. In its amended answer, the Government mistakenly entitled its four-count cross-claim as a counterclaim. Amended Answer and Affirmative Defenses of Defendant United States to Sec-

ond Amended Complaint and to Cross–Claim of Defendant Waste Control of Florida, Inc., Waste Management, Inc., and Refuse Services, Inc.[,] and Counterclaim of Defendant United States

ed Answer and Affirmative Defenses of Defendant United States to Second Amended Complaint and to Cross–Claim of Defendant Waste Control of Florida, Inc., Waste Management, Inc., and Refuse Services, Inc.[,] and Counterclaim of Defendant United States Against Waste Control of Florida, Inc., Waste Management, Inc., and Refuse Services, Inc., filed on April 24, 1991.[6] Count I of the Government's cross-claim is an action for indemnity; Count II is an action for contribution; Count III is an action for breach of contract; and Count IV is an action for Breach of Duty of Workmanlike Performance.

On May 10, 1991, the Waste Haulers filed their answer and affirmative defenses to the Government's cross-claim. Answer and Affirmative Defenses of Defendants Waste Control of Florida, Inc., Waste Management, Inc., and Refuse Services, Inc.[,] to Defendant United States' Counterclaim, filed on May 10, 1991.

### III. THE PARTIES' POSITIONS

#### A. The Government's Position

The Government alleges that the plaintiffs' case falls within the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). The Government alleges that materials which the Navy placed in the dumpsters were specifically authorized by the waste disposal contracts. Moreover, even if the Navy did in fact place unauthorized materials in the dumpsters, the Government contends that the Navy did not have a mandatory duty to segregate its waste to ensure that only authorized materials were placed in the dumpsters. Furthermore, pursuant to the Navy's contracts with Waste Control, the Government contends that the Navy delegated its responsibility for the proper

disposal of its refuse to Waste Control. Thus, the Government alleges that the plaintiffs have failed to identify a single mandatory and specific duty contained in the contracts or elsewhere which the Navy allegedly violated, and, therefore, pursuant to the discretionary function exception to the FTCA, the Court does not have subject matter jurisdiction.

In support of its contention, the Government states that the contracts required Waste Control to furnish transportation, materials, equipment, supplies, and supervision necessary to perform the collection and disposal of refuse and trash. The Government further contends that, even though the Navy retained the authority to monitor the performance of these contracts and randomly inspected the dumpsters to be sure that prohibited materials were not present, the Navy's exercise of this supervisory authority to oversee Waste Control's execution of the waste disposal contracts was discretionary. Lastly, the Government alleges that the contracts clearly state that Waste Control was responsible for complying with all laws, ordinances, statutes, and regulations pertaining to the collection, transportation, and disposal of the Navy's waste. Therefore, the Government alleges that the Navy's responsibility for the disposal of its waste ended at the base perimeter.

The second part of the Government's motion addresses the Waste Haulers' cross-claims for contribution and indemnity. Regarding contribution, the Government alleges that since it is not liable to the plaintiffs, it is not liable for contribution. Regarding indemnity, the Government states that there is no possibility that the Waste Haulers can be found liable without fault, and under Florida law, that precludes tort indemnity.

Against Waste Control of Florida, Inc., Waste Management, Inc., and Refuse Services, Inc., filed on April 24, 1991.

6. On March 29, 1991, the Court granted the Government leave to file its answer to the Waste Haulers' cross-claim and its cross-claim against the Waste Haulers. Order, filed on March 29, 1991. Apparently, on January 11, 1989, the Government served such a pleading on the

Waste Haulers. However, for reasons unknown, this pleading is not in the Court's files. On February 1, 1989, the Waste Haulers filed its answers and affirmative defenses to the Government's missing cross-claim. Answers and Affirmative Defenses of Defendants Waste Control of Florida, Inc., Waste Management, Inc.[,] and Refuse Services, Inc.[,] to Counterclaim of Defendant United States, filed on February 1, 1989.

## B. The Plaintiffs' Positions

The plaintiffs allege that the Navy breached its own internal regulations and its contractual provisions with Waste Control by failing: (1) to segregate its waste before placing it in the dumpsters, thus allowing unauthorized materials to be placed in the dumpsters; (2) to inspect the dumpsters to ensure that unauthorized waste had not been disposed of; and (3) to supervise Waste Control non-negligently. These regulations and contractual terms were mandatory and, therefore, the failure of Naval personnel to abide by them results in the inapplicability of the discretionary function exception.

In support of their contention, the plaintiffs allege that the terms of the waste disposal contracts prohibited the Navy from disposing of acids, flammable liquids, explosives, and other similar materials in the dumpsters. The plaintiffs also allege that there were written Naval directives or policies regarding what substances were prohibited from being placed in the dumpsters. Furthermore, the plaintiffs allege that it was implicit in the contracts that the responsibility for segregating waste and regulating what was placed in the dumpsters fell upon the Navy.[7] Thus, by improperly disposing of unauthorized materials in the dumpsters and failing to inspect the dumpsters to ensure compliance with the waste disposal contracts, the Navy violated its mandatory obligations.[8]

In support of their claim of negligent supervision by the Navy, the plaintiffs cite to contractual terms in which the Officer in Charge was to notify the Contractor of any noncompliance and require corrective action to be taken. The plaintiffs further cite to a governmental requirement that all waste removal contracts should provide for regular governmental inspections.

## C. The Waste Haulers' Position

The Waste Haulers contend that once the Navy exercised its discretion by entering into the waste disposal contracts, it had a mandatory duty to execute the contracts in a non-negligent manner. The Waste Haulers allege that the Navy: (1) improperly included unauthorized materials in the dumpsters; (2) failed to properly inspect the dumpsters to ensure that unauthorized materials had not been placed in the dumpsters; and (3) failed to properly supervise all phases of Waste Control's work practices in connection with the collection and disposal of the garbage, refuse, and trash. Thus, the Waste Haulers allege that the discretionary function exception is inapplicable.

Furthermore, the Waste Haulers contend that Navy personnel fully recognized their contractual responsibility to supervise the execution of the waste disposal contracts. The Waste Haulers allege that:

Navy personnel determined the location and schedule of dumpster pick-up; recognized the specific restrictions as to the types of waste which could be deposited in base dumpsters for pick up by Waste control [sic]; recognized their responsibility for inspecting dumpsters to ensure that proper materials were being placed in them, in conformance with the contract, including the General Safety Requirements; monitored implementation of the contract; were aware that the material collected at the navy bases was disposed of by Waste Control at the Hipps Road Landfill; and maintained constant contact with Waste Control concerning performance of the contract.

Waste Management, Inc., Waste Control of Florida, Inc., and Refuse Services, Inc.'s Memorandum in Opposition to the Motion of the United States for Summary Judg-

---

7. The plaintiffs contend that the Naval employees' failure to properly discharge this duty resulted in the improper disposal of hazardous waste at the Landfill, which in turn led to the plaintiffs' injuries.

8. The plaintiffs further allege that the Navy itself actually disposed of materials at the Land-

fill and have provided the Court with evidence which supports this allegation. Plaintiffs' Memorandum in Support of Their Cross-Motion for Summary Judgment and In Opposition to Motion for Summary Judgment of Defendant United States, Exhibit V at 29–34, 41, 86–90, filed on February 27, 1991.

ment on Plaintiffs' Complaint and Co–Defendants' Cross–Claim at 18, filed on March 15, 1991. The Waste Haulers allege that these supervisory responsibilities were not discretionary, but rather mandatory. As such, the discretionary function exception does not preclude an action based upon the Navy's negligent performance of these duties.

Alternatively, the Waste Haulers argue that the Government may be liable under the FTCA for negligently carrying out its nondelegable duty of properly disposing of ultra-hazardous wastes. The Waste Haulers allege that Florida law does not allow an employer to delegate its duty of care to an independent contractor when the work performed is inherently dangerous.

Regarding their cross-claim for contribution, the Waste Haulers argue that since the Government is not entitled to the discretionary function exception to the FTCA, their cross-claim for contribution must stand. Regarding their cross-claim for indemnity, the Waste Haulers state that as a result of the nondelegable duty, they may be found liable without fault. Thus, their cross-claim for indemnity must remain.

## IV. STANDARD OF REVIEW FOR MOTION FOR SUMMARY JUDGMENT

■■■ A district court's review of a case on a motion for summary judgment is governed by Fed.R.Civ.P. 56. A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the district court that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party has so discharged its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there

is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553.

■■■ The district court must enter summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552; Fed.R.Civ.P. 56(c). *See also Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 843–44 (11th Cir.1989). Whether or not the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law, requires the court to draw inferences from the evidence as viewed in the light most favorable to the nonmoving party, and to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir.1989). The Eleventh Circuit Court of Appeals explained the reasonableness standard in *WSB–TV v. Lee:*

> In deciding whether an inference is reasonable, the court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 493 (5th Cir. Unit B 1982). The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988).

Rule 56(c) requires the district court to deny a motion for summary judgment if the court finds that there exists a genuine issue for trial. What constitutes a "genuine issue for trial" was addressed by the Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Anderson*, the Court stated that "summary judgment will

not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. at 2505, 2510, 91 L.Ed.2d 202 (1986). The Court further stated that the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

## V. DISCRETIONARY FUNCTION EXCEPTION

"The FTCA, subject to various exceptions [in § 2680], waives sovereign immunity from suits for negligent or wrongful acts of Government employees." *United States v. Gaubert,* —— U.S. ——, 111 S.Ct. 1267, 1271 n. 4, 113 L.Ed.2d 335 (1991). Among these exceptions is the "discretionary function" exception at issue in this case. This exception provides that the Government is not liable for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

Until recently, the United States Supreme Court cases analyzing this exception have not provided a definitive answer to the question of when the discretionary function exception applies. *See Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *United States v. S.A. Empresa Aerea de Viacao Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Accordingly, litigants arguing either side of the discretionary function exception argument had ample language to select from in support of their positions. Such was the situation in this case. However, after the parties had fully briefed their positions regarding the applicability of the discretionary function exception in the FTCA, and after this Court heard oral argument, the United States Supreme Court decided *United States v. Gaubert,* —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), its latest pronouncement on the application of the discretionary function exception.

The question before the Supreme Court in *Gaubert* was "whether certain actions taken by the [Federal Home Loan Bank Board] and [the Federal Home Loan Bank–Dallas] are within the 'discretionary function' exception to the liability of the United States under the FTCA." *Gaubert*, 111 S.Ct. at 1271. In reaching its decision, the Supreme Court provided the following analysis of the discretionary function exception:

> The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," *Berkovitz*, 486 U.S. at 536 [108 S.Ct. at 1958]; and "it is the nature of the conduct, rather than the status of the actor," that governs whether the exception applies. *Varig Airlines*, 467 U.S. at 813 [104 S.Ct. at 2764]. The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option to adhere to the directive." *Berkovitz*, 486 U.S. at 536 [108 S.Ct. at 1958].
>
> Furthermore, even "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *id.* [467 U.S.] at 814 [104 S.Ct. at 2764], when properly construed, the exception

"protects only governmental actions and decisions based on considerations of public policy." *Id.* [486 U.S.] at 537 [108 S.Ct. at 1959].

. . . .

[T]herefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. *If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy.* On the other hand, if the regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Gaubert,* 111 U.S. at 1273–74 (emphasis added) (citations omitted).

## VI. ANALYSIS

It is important to first determine what is not at issue. All parties agree that the Navy's decision to use contractors to dispose of its waste falls within the discretionary function exception to the FTCA. Furthermore, all parties agree that the decision as to what to delegate to the contractor in the waste disposal contracts also falls within the discretionary function exception. Thus, what the Court must determine is whether the Navy's internal regulations and policies or the waste disposal contracts contained mandatory duties which the Navy failed to perform. Furthermore, if the Court finds that the Navy did not violate any mandatory duties, the Court must then determine whether Congress intended to shield the Navy from liability when the Navy exercised its discretion in the execution of these contracts.

### A. Did The Navy Dispose of Unauthorized Materials?

█ The plaintiffs have presented evidence that the Navy regularly disposed of numerous flammable solvents, paint and solvent cans, paint shavings, and paint thinners.[9] Plaintiffs' Memorandum in Support of Their Cross–Motion for Summary Judgment and in Opposition to Motion for Summary Judgment of Defendant United States, Exhibits C, D, H, J, K, M, N, O, filed on February 27, 1991.[10] The Govern-

9. The plaintiffs contend that these types of waste were eventually dumped at the Hipps Road Landfill. The plaintiffs have also presented evidence that full five gallon cans of paint, full fifty-five gallon drums of chemicals, airplane parts, cans of grease and oil, and barrels of paint thinner were found at the Landfill and that Government serial numbers and "NAS" was on much of the waste. Plaintiffs' Memorandum in Support of Their Cross–Motion for Summary Judgment and in Opposition to Motion for Summary Judgment of Defendant United States, Exhibit P at 52–62, filed on February 27, 1991. *Id.,* Exhibit Q at 21–23, 39–44.

10. Elmer Raisch, a supervisor in the aircraft painting division, testified that mostly empty five-gallon paint cans and empty thinner cans were placed in the dumpsters. *Id.,* Exhibit C at 35. Sampie Sutton, a waste disposal supervisor at N.A.S. Jacksonville, testified that he found liquids, paint, and paint containers in the dumpsters. *Id.,* Exhibit D at 51, 62–64, filed on February 25, 1991. Neil Hansen, a fireman and fire inspector at N.A.S. Cecil Field, by affidavit, stated that Naval employees regularly disposed of hazardous chemicals and industrial waste in the dumpsters. He specifically named paints, lacquer thinner, acetone, volatile paint thinners, and aircraft cleaning compound as being included in this waste. *Id.,* Exhibit H at 1–2. Russ Robinson and Ralph Gillespie, sewage treatment plant operators during the period at issue, testified that the dumpsters adjacent to the treatment plants were filled with paint shavings, paint cans, skimmings from the industrial treatment plant, and stained rags used to clean the plants. *Id.,* Exhibit J at 113–114, and Exhibit K at 63, 66–68. John Coffrin, a Naval employee who worked in a paint shop in the industrial area of N.A.S. Jacksonville, testified that cans of outdated paint, paint waste, waste paint thinners, lacquers, acrylic enamels, and paint and solvent residue were thrown into the dumpsters. *Id.,* Exhibit M at 23, 25–26, 38. Julian S. Hunt, Jr., an employee in the power plant division paint shop, testified that he personally had the responsibility of placing empty paint cans and empty solvent cans, such as toluene, naphtha, and lacquer thinner in the dumpsters. *Id.,* Exhibit N at 42–46. Wallace Laney testified that small capacitors containing polychlorinated biphenyls, paint residue and paint cans were placed in the dumpsters. *Id.,* Exhibit O at 29, 33, 38.

ment has not presented evidence to the contrary. Rather, the Government contends that all of the materials identified by the plaintiffs as having been placed in the dumpsters were authorized materials pursuant to the terms of the waste disposal contracts. Defendant United States of America's Opposition to Plaintiffs [sic] Cross Motion for Summary Judgment at 5 n. 2, filed on March 5, 1991.

All of the available contracts between Waste Control and N.A.S. Cecil Field state that:

> Garbage, refuse and trash for collection and disposal shall include residential type kitchen waste, paper, rags, cloth, cans, bottles, boxes, cartons, crates, worn-out household articles and other material which may be discarded by the occupants of quarters; grass, tree branches, and other articles of similar character, *but not including* such materials as lumber or iron pipe exceeding five feet in length, concrete blocks, cement, *acids, flammable liquids,* explosives, ice boxes, refrigerators, deep freezers, ranges, bed springs, sofas, water heaters, water tanks, sinks, and other similar materials or equipment of a weighty or bulky nature.

Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co-Defendants' Cross-Claims, Exhibit 3, Cecil Field Contract, Contract No. N62467-68-C-5743, NAVFAC Spec. 90210/67, at § 3.1, filed on February 4, 1991 (emphasis added).[11] Similarly, the available contracts between Waste Control and N.A.S. Jacksonville state that:

> Garbage, refuse, and trash for collection and disposal shall include residential, barracks, hospital, industrial, and other type waste, including kitchen waste, sludge, paper, rags, cloth, cans, bottles, boxes, cartons, crates, worn-out household articles and other material which may be discarded by the occupants of buildings, grass, tree branches, and other articles of similar character that are placed in the containers, *but not including* such materials as lumber or iron pipe exceeding 5 feet in length, concrete blocks, cement, *acids, flamable [sic] liquids,* explosives, ashes, dead animals, ice boxes, refrigerators, deep freezers, ranges, bed springs, sofas, water heaters, water tanks, sinks, and other similar materials or equipment of a weighty or bulky nature.

*Id.,* Exhibit 6, N.A.S. Jacksonville Contract, Contract No. NBy(U)-76074, NAVFACENGCOM Spec. No. 76074/66, at § 3.1 (emphasis added).[12]

Although the Government is correct that the N.A.S. Jacksonville contracts authorized the disposal of industrial waste, these contracts still prohibited the Navy from placing acids and flammable liquids in the dumpsters. While the contracts do not define flammable, the General Safety Requirements Manual, which was incorporated by reference into the contracts, states that flammables include paints, varnishes, lacquers, thinners, and other volatile painting materials, as well as paint scrapings and paint-saturated debris. *Id.,* Exhibit 14, General Safety Requirements Manual prepared by the United States Army Corps of Engineers, March 13, 1958, at 31–32, §§ 12–55, –57, –60; *Id.,* Exhibit 15, General Safety Requirements Manual prepared by the United States Army Corps of Engineers, March 1, 1967, at 36–37, §§ 12.-F.01, .05. Thus, by the waste disposal contracts' own terms, coupled with the Gener-

---

**11.** The 1969 and 1970 contracts are identical with the exception that the word "Garbage" was deleted from the beginning of the section. Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co-Defendants' Cross-Claims, Exhibit 4, Cecil Field Contract, Contract No. N62467-69-C-5724, NAVFAC Spec. No. 06-69-5742, at § 3.1, filed on February 4, 1991; *Id.,* Exhibit 5, Cecil Field Contract, Contract No. N62467-70-C-5729, NAVFAC Spec. No. 06-70-5729 (rev.), at § 3.1.

**12.** This section is from the 1966 contract; the 1968 contract is not available. The language in the 1969 and 1970 contracts regarding authorized and unauthorized materials, although not identical, is similar to that contained in the 1966 contract. *Id.,* Exhibit 7, N.A.S. Jacksonville Contract, Contract No. N62467-69-C-5967, NAVFAC Spec. No. 06-69-5967, at § 3.1; *Id.,* Exhibit 8, N.A.S. Jacksonville Contract, Contract No. N62467-70-B-5976, at § 4.1.

al Safety Requirements Manual, the Navy was prohibited from placing flammable solvents, paint and solvent cans, paint shavings, and paint thinners in the dumpsters.

### B. Did The Navy Have a Mandatory Duty?

■ Although the Court has determined that unauthorized materials were placed in the dumpsters in violation of the waste disposal contracts, the Court must still determine whether such activity violated a mandatory duty. The Government would have the Court hold that the Navy had no duty to ensure that the waste which Waste Control hauled from the bases did not contain unauthorized materials. Rather, the Government contends that Waste Control had the duty to inspect each dumpster for unauthorized materials before it transported the waste to the Landfill.[13]

The Court finds that the Navy had a mandatory duty to ensure that unauthorized materials were not placed in the dumpsters by segregating its waste. While this duty was not explicitly stated in the waste disposal contracts, the Court finds that it was implicit in the contracts. Common sense dictates that if parties to a contract agree that only certain materials may be disposed of in dumpsters, the party disposing of the materials has the obligation to ensure that it complies with the terms of the contract.

For the Court to find otherwise, would require the Court to hold that Waste Control had the duty to sift through the waste in each of its dumpsters prior to pickup to ensure that the Navy was not breaching its contract. Furthermore, such an obligation would be expected to be explicitly stated in the waste disposal contracts. Nowhere in any of the waste disposal contracts can such a duty be found.

Moreover, the Waste Haulers have presented evidence which indicates that the Navy was fully cognizant of its obligation. At N.A.S. Jacksonville, supervisors and written notices informed employees that chemicals and flammable materials were not to be placed in the dumpsters. Exhibits to Defendant Waste Haulers' Memorandum in Opposition to the Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co–Defendants' Cross–Claim, Exhibit 2 at 16, 21, filed on March 5, 1991. Id., Exhibit 8 at 10, 12–14; Id., Exhibit 11 at 8, 10, 12–14, 18–20, 27; Id., Exhibit 16 at 18–19; Id., Exhibit 19 at 72–73; Id., Exhibit 20 at 32–35; Id., Exhibit 23 at 24–25; Id., Exhibit 24 at 101–102; Id., Exhibit 25 at 21; Id., Exhibit 26 at 25, 50–51, 59, 63–64, 70.

The Court finds that the Navy violated its mandatory duty to ensure that unauthorized materials were not included in the waste which Waste Control removed from the dumpsters. Having found that a mandatory duty was not performed, the Court finds that there is no genuine issue of material fact regarding the inapplicability of the discretionary function exception.[14] Therefore, the Court will grant the Plaintiffs' Cross–Motion for Summary Judgment Against Defendant United States for Order That the Discretionary Function Exception to the Federal Tort Claims Act is

---

13. In its response to the plaintiffs' cross-motion for summary judgment, the Government states that the "plaintiffs have failed to point to any provision in the contracts which imposes upon the Navy or its employees a mandatory and specific obligation to segregate waste." Defendant United States of America's Opposition to Plaintiffs [sic] Cross Motion for Summary Judgment at 3, filed on March 5, 1991. The Government further claims that "there is no language which imposes a specific and mandatory duty on Navy employees to insure that only authorized waste is ever placed in the dumpsters." Id.

Additionally, when asked at oral argument whether it was the "Navy's position that they had no duty to segregate the wastes prior to

placing it in the dumpsters," the Government responded that "There's no duty in either the Cecil Field or the N.A.S. Jax contracts to segregate the wastes." Transcript of Hearing on Pending Motions at 21–22, filed on March 29, 1991. Furthermore, the Government stated that the Waste Haulers were supposed to take the dumpster bins and go through them. Id. at 22.

14. In light of this finding, the Court need not determine whether the Navy also breached a mandatory duty to supervise the Waste Haulers' activities. Additionally, the Court need not reach the issue of whether the Navy had a nondelegable duty to properly dispose of hazardous materials.

Inapplicable to This Case, filed on February 25, 1991; and deny that portion of the Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co-Defendants' Cross-Claims, filed on February 4, 1991, which addresses the discretionary function exception.

## VII. CROSS-CLAIMS

### A. Contribution

■ The basis for the Government's motion for summary judgment as to the Waste Haulers' cross-claim for contribution is the Florida Contribution Among Tortfeasors Act, Fla.Stat. § 768.31. Pursuant to § 768.31, contribution is available only against a party who is liable in tort to the underlying plaintiff. The Government contends that since the discretionary function exception bars the plaintiffs' cause of action against the Government, it cannot be liable for contribution to the Waste Haulers.

Since the Court has found that the discretionary function exception is inapplicable, the Government remains potentially liable to the plaintiffs. Therefore, the Court will deny the that portion of the Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co-Defendants' Cross-Claims, filed on February 4, 1991, which addresses the Waste Haulers' cross-claim for contribution.

### B. Indemnity

In their cross-claim for indemnity, the Waste Haulers allege that if they are liable to the plaintiffs, their liability is solely constructive, secondary, derivative, or technical and without fault. The Waste Haulers contend that such liability is the direct result of negligence and breach of contractual duty by the Navy.

■ In its motion for summary judgment, the Government contends that there is no possibility that the Waste Haulers could be found liable and yet be without fault. Therefore, based upon Florida case law, the Government maintains that the Waste Haulers' cross-claim for indemnity must fail.

Pursuant to Florida law, the right to indemnity:

> inures to one who discharges a duty owed by him, but which, as between himself and another, should have been discharged by the other.... It shifts the entire loss from one who, although without active negligence or fault, has been obligated to pay, because of some vicarious, constructive, derivative, or technical liability to another who should bear the costs because it was the latter's wrong doing for which the former is held liable.

*Houdaille Industries, Inc. v. Edwards,* 374 So.2d 490, 492–93 (Fla.1979). Thus, the right to indemnity can only be applied to a party who through no fault of its own has been found liable.

■ Rather than speculating whether or not there is any possibility that the Waste Haulers could be found liable to the plaintiffs and yet be without fault, the Court finds that this issue is prematurely before the Court. This is a question which should be addressed after a determination of liability, if any. Therefore, the Court will deny, without prejudice, that portion of the Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co-Defendants' Cross-Claims, filed on February 4, 1991, which addresses the Waste Haulers cross-claim for indemnity. Upon conclusion of the trial, the Government, if necessary, may renew this motion.

## VIII. CONCLUSION

The Court finds that the Navy violated a mandatory duty to ensure, by segregating its waste, that unauthorized materials were not placed in the dumpsters. Accordingly, the Court finds that the discretionary function exception is inapplicable. The Court further finds that the Waste Haulers' cross-claims against the Government are not resolved by the Government's motion for summary judgment. Therefore, the Court will deny the Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co-Defendants' Cross-Claims, filed on February 4, 1991, and grant Plaintiffs' Cross-Motion for

Summary Judgment Against Defendant United States for Order That the Discretionary Function Exception to the Federal Tort Claims Act is Inapplicable to This Case, filed on February 25, 1991.

Accordingly, it is

ORDERED:

1. That the Motion of the United States for Summary Judgment on Plaintiffs' Complaint and Co–Defendants' Cross–Claims, filed on February 4, 1991, is denied.

2. That the Plaintiffs' Cross–Motion for Summary Judgment Against Defendant United States for Order That the Discretionary Function Exception to the Federal Tort Claims Act is Inapplicable to This Case, filed on February 25, 1991, is granted.

DONE AND ORDERED.