MARBULK SHIPPING, INC., Plaintiff,

v.

MARTIN–MARIETTA MATERIALS,
INC., et al., Defendants.

No. CIV.A. 02–0190–WS–L.

United States District Court,
S.D. Alabama,
Southern Division.

March 17, 2004.

Grover E. Asmus, II, Armbrecht Jackson LLP, Mobile, AL, Patricia Nicole Beyer, U.S. Attorney's Office, Mobile, AL, John F. Fay, Jr., Deutsch, Kerrigan & Stiles, New Orleans, LA, Samuel B. Gabb, Lundy & Davis, L.L.P., Lake Charles, LA, Matthew J. Glomb, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, Allen E. Graham, Lyons, Pipes & Cook, Mobile, AL, Daniel J. Hoerner, Mouledoux, Bland, LeGrand & Brackett, New Orleans, LA, Alex F. Lankford, III, Hand Arendall, L.L.C., Mobile, AL, Andre J. Mouledoux, Mouledoux, Bland, LeGrand & Brackett, New Orleans, LA, Marion A. Quina, Jr., Lyons, Pipes & Cook, Mobile, AL, William K. Terrill, II, Deutsch, Kerrigan & Stiles, New Orleans, LA, Ray M. Thompson, Mobile, AL, G. Hamp Uzzelle, III, Hand Arendall, L.L.C., Mobile, AL, for Defendants.

Edward Brough Holzwanger, Miller, Hamilton, Snider & Odom, Mobile, AL, Gregory C. Buffalow, Miller, Hamilton, Snider & Odom, Mobile, AL, for Plaintiff.

### ORDER ON THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

STEELE, District Judge.

This action is before the Court on the motion of the United States for summary judgment as to all remaining claims brought against the federal defendants by plaintiff Marbulk Shipping, Inc. ("Marbulk"). (Docs.202, 220). The parties have filed briefs and evidentiary materials supporting their respective positions, (Docs.203, 221–22, 245,

251–52),[1] and the motion is ripe for resolution. After carefully considering the foregoing materials, the Court concludes that the United States' motion for summary judgment is due to be granted.

## BACKGROUND

Marbulk is the owner and/or operator of the M/V BAHAMA SPIRIT ("the Vessel"). Shortly after midnight on March 27, 2001, the Vessel entered a turning basin ("the Basin") reached by the Theodore Ship Channel ("the Channel"), heading generally west. The Vessel carried a load of limestone for discharge at a facility along the northern bank of the Channel. The Basin lay immediately south of the facility. To position its port side alongside the facility, the Vessel was required to execute a 180–degree turn in the Basin, which it performed in a clockwise direction. Early in the maneuver, the stem apparently struck a submerged dredge pipe, as well as the sloping bank of the Basin, damaging the Vessel's rudder.

Marbulk has sued three federal defendants: (1) the United States Army Corps of Engineers ("the Corps"); (2) the National Ocean Survey and National Oceanic and Atmospheric Administration ("NOAA"); and (3) the United States Coast Guard ("the Coast Guard"). Marbulk has sued these agencies for negligence in inspecting, maintaining and depicting the Basin and in failing to remove or warn about hazards to navigation in the Basin. In particular, the second amended complaint alleges that the federal defendants:

- failed to survey, ascertain, locate and remove the dredge pipe and to properly maintain and inspect the berth, its approaches and the Basin;
- failed to conduct timely hydrographic surveys and inspections to ensure the removal of dredging equipment from, the absence of underwater obstructions in, and the proper marking and sufficient lighting of, the Basin;
- failed to give notice that the dredge pipe or underwater hazard was there;

- failed to take steps to prevent the dredge pipe and/or underwater hazard and remove them;
- published and distributed an official chart incorrectly omitting the existence of the dredge pipe and providing incorrect information as to the depth and dimensions of the Basin (NOAA only);
- failed to mark the dredge pipe and underwater hazard (Coast Guard only);
- failed to consult with other agencies (Corps only);
- failed to perform adequate maintenance of the Basin (Corps only);
- failed to monitor dredge operations and ensure removal of dredge pipe by dredge operators (Corps only).

(Doc. 137, ¶¶ 22A–H, 43, 47, 48).

On the Coast Guard's previous motion to dismiss, the Court dismissed all claims against the Coast Guard based on its failure to establish an aid to navigation in the Basin, on the grounds of discretionary function immunity. (Doc. 166). The United States' present motion seeks dismissal of the balance of Marbulk's claims against the federal defendants, principally on the same grounds.

## DETERMINATIONS OF UNCONTROVERTED FACT

The Basin was designed and constructed with a slope of approximately 1V:3H. (Exhibits 138, 166).

The federal defendants were unaware of the existence of the dredge pipe before the Vessel struck it. (Doc. 221 at 21).

Chart 11376, published by NOAA, depicts the shoreline of the Basin with a continuous black line. (USA Exhibit 260).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1333. Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b).

---

1. Defendant Bean Dredging L.L.C. ("Bean") has also weighed in on the United States' motion.

Its motion for leave to file a reply brief, (Doc. 253), is **granted**.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986))(footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted).

## I. Discretionary Function Immunity.

█ As noted in the Court's order granting the Coast Guard's motion to dismiss, the Suits in Admiralty Act ("SAA") provides "the sole jurisdictional basis for admiralty claims against the United States" that do not involve a public vessel. *Mid–South Holding Co. v. United States,* 225 F.3d 1201, 1203 (11th Cir.2000). The SAA includes an express waiver of the federal government's sovereign immunity, 46 U.S.C. app. § 742, but the waiver is subject to various exceptions, including the "discretionary function" exception.

█ "[T]he Eleventh Circuit has held that the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), applies to suits under the SAA." *Drake Towing Co. v. Meisner Marine Construction Co.,* 765 F.2d 1060, 1063–64 (11th Cir.1985). Thus, case law developing the discretionary function exception in the context of the Federal Tort Claims Act ("FTCA") is applicable in construing the corresponding exception under the SAA. *United States Fire Insurance Co. v. United States,* 806 F.2d 1529, 1535 (11th Cir.1986).

█ If the discretionary function exception applies, the Court lacks subject matter jurisdiction, and dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is required. *Mid–South Holding Co. v. United States,* 225 F.3d at 1202; *Cohen v. United States,* 151 F.3d 1338, 1340 (11th Cir.1998). The burden of proof concerning the discretionary function exception lies with the plaintiff. *OSI, Inc. v. United States,* 285 F.3d 947, 951 (11th Cir.2002).

█ The Supreme Court's most recent, and most thorough, explication of the discretionary function exception under the FTCA appears in *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). As the Eleventh Circuit has observed, "[i]n *Gaubert,* the Supreme Court developed a two-step test to determine whether the government's conduct meets the discretionary function exception." *Miles v. Naval Aviation Museum Foundation, Inc.,* 289 F.3d 715, 720 (11th Cir.2002). First, the discretionary function exception cannot apply if governing statutes, regulations or policy dictate the government's course of action, for in that case there is no discretion to be exercised. 499 U.S. at 324, 111 S.Ct. 1267. Second, the challenged discretionary act must be " 'of the kind that the discretionary function exception was designed to shield,' " that is, one " 'based on considerations of public policy.' " *Id.* at 322–23, 111 S.Ct. 1267 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) and *Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), respectively).

Citing a plethora of case law, the United States argues that it has discretion to make decisions in each of the particulars alleged by Marbulk and that its discretion in each instance is based on considerations of public policy. Marbulk neither denies that these

cases support the United States' use of them nor appeals to any statute or regulation ignored by them. Instead, Marbulk argues that internal agency documents, unnoted by courts in past decisions, deprive the agencies of discretion in certain respects and thus, to that extent, defeat immunity at the first step in the *Gaubert* analysis.[2]

■ Most of Marbulk's effort is directed towards the Corps. Marbulk first cites provisions from two dredging contracts.[3] In a contract with Bean dating to 1991, the contractor agrees to recover and remove any items that, "in the opinion of" the Corps' contracting officer, may be dangerous to or obstruct navigation. In a contract dating to 1993, the contractor agrees to remove from the work and the premises all equipment and materials that are not the property of the government. (Doc. 245 at 4–5).[4] The difficulty is that, by their terms, these provisions place no duty on *the Corps* but only on the contractor.

To counter this objection, Marbulk points to an agency guideline calling for the Corps' dredge inspector to "assure that the work is being accomplished in accordance with the plans and specifications" and stating that the inspector "should pay particular attention to those portions of the contract and specifications pertaining to ... misplaced material, location of obstructions ... and side slopes." (Doc. 245 at 6). Construed most generously

to Marbulk, this provision directs the Corps to supervise the contractor's performance. It does not, however, "specify *how* the [Corps] would carry out that supervision." *Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir.1997)(emphasis added). On the contrary, the instruction simply directs the inspector back to the contract language, which expressly preserves his discretion to form his own "opinion" as to whether removal is needed.

To defeat discretionary function immunity at the first *Gaubert* step, the directive at issue must "specifically prescrib[e] a course of action ... embodying a fixed or readily ascertainable standard." *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir.1993)(internal quotes omitted). Thus, in *Autery*, a policy to " 'make every effort within the constraints of budget, manpower, and equipment available to recognize and report' hazardous trees" could not defeat immunity at the first step, because the policy "did not compel park employees to inspect certain trees on certain days or remove a particular number of trees per week." *Id.* at 1528–29. Likewise here, a directive to "pay particular attention" to certain contract terms concerning obstructions and side slopes provides no "fixed or readily ascertainable standard" but merely exhorts the exercise of care. Thus, as in *Andrews*, "the [Corps] acted within the province of its discretion in deciding how to

2. The United States suggests that internal documents as a matter of law cannot be relied upon at the first step of *Gaubert*. (Doc. 203 at 15; Doc. 252 at 4–5). On the contrary, *Gaubert* expressly recognizes that mandatory directives can be found, not only in statute or regulation, but in "policy." 499 U.S. at 324, 111 S.Ct. 1267 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). Thus, the Eleventh Circuit has held that mandatory responsibilities set out in the Corps' "safety manual" defeated discretionary function immunity. *Phillips v. United States*, 956 F.2d 1071, 1076 (11th Cir.1992). Similarly, an agency's "internal policy" was sufficient to defeat discretionary function immunity in *Dickerson, Inc. v. United States*, 875 F.2d 1577, 1581 (11th Cir. 1989). Even an agency's contract may defeat discretionary function immunity. *See Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir. 1997).

3. While Marbulk purports to quote selectively from these and the other internal documents on

which it relies, it has placed none of them into evidence. This might have been a fatal deficiency had the United States objected or accused Marbulk of offering incorrect or misleading quotes. The United States' failure to do so, however, compels the Court to consider Marbulk's quotations as accurate renditions of record evidence.

4. Neither of these contracts corresponds with Bean's alleged deposit of the offending dredge pipe in 1999. However, Marbulk notes that a 1990's contract solicitation document, as well as the specifications for the original, 1979 dredging, contain language substantively identical to that found in the 1991 Bean contract. Marbulk argues that this evidence supports a reasonable inference that similar language was used in Bean's 1999 contracts. (Doc. 245 at 5–6). For present purposes, the Court will assume without deciding that such a reasonable inference exists.

supervise [the contractor's] performance under the contract." 992 F.2d at 1529.

■ Second, Marbulk cites to specifications requiring the dredging contractor to confine all operations, including storage of materials, to areas authorized or approved by the Corps. (Doc. 245 at 6–7). Marbulk stresses that the term "shall confine" is mandatory, but that language imposes a duty only on the contractor, not on the Corps.

Third, Marbulk relies on a Corps internal document stating that "[c]harts shall be drafted to depict necessary and useful features for navigation, ... includ[ing] ... shorelines (at selected datum) [and] shoreline features ...." (Doc. 245 at 17). This document, however, relates to "navigation charts," (id.), not to the "shoreline surveys" made the basis of Marbulk's complaint. (Id. at 16). Nor has Marbulk explained how the bland terms "shoreline" and "shoreline features" can encompass soundings that necessarily are taken beyond the shoreline.[5]

■ Fourth, Marbulk cites a Corps document stating that "[n]ecessary measures will be taken to insure that such information [that is, "the latest detailed information concerning channel conditions"] is reported without delay" to NOAA, the Coast Guard and other entities. The same document states that "information thereon [concerning "dangerous shoaling"] will be furnished immediately [upon discovery]" to the same agencies. (Doc. 245 at 20). Assuming without deciding that this requirement is sufficiently specific to strip the Corps of immunity, it has no application to this lawsuit. At best, these provisions require the Corps to report changes in channel conditions as it discovers them. It is uncontroverted that the slope of the Basin dates from its original construction in 1979 and thus does not represent a changed condition. It is also uncontroverted that the Corps never discovered the dredge pipe so as to trigger its reporting obligation.

Turning to NOAA, Marbulk relies on the agency's hydrographic manual, which requires that the shoreline be depicted by a continuous black-inked line. (Doc. 245 at 17–18). This duty may deprive NOAA of discretion but, because Chart 11376 does in fact mark the shoreline of the Basin with a continuous black-inked line, it cannot form the basis of liability.

■ Marbulk also notes the hydrographic manual's direction that the supervisor take care to "make sure that the soundings are sufficient to show the limits and navigable depth of the channel throughout its entire length." (Doc. 245 at 17). A directive to ensure the sufficiency of soundings cannot defeat discretionary function immunity because it does not "specifically prescrib[e] a course of action ... embodying a fixed or readily ascertainable standard"; the agency is left free to determine both what level of soundings is "sufficient" and what steps to take to "make sure" that the soundings are sufficient.

■ With respect to the Coast Guard, Marbulk argues that, in a 1977 design memo, the Coast Guard assumed a mandatory duty to "review the aids to navigation in Theodore generally and that 'corrective measures will be taken as necessary.'" (Doc. 245 at 26–27). It is far too late for Marbulk to resurrect a claim laid to rest on motion to dismiss some nine months ago. At any rate, the quoted language on its face does not rob the Coast Guard of its discretion in assessing whether an aid to navigation is "necessary."

Marbulk offers no internal agency documents concerning any of the other allegations of negligence raised in its second amended complaint. As to those claims, the agencies' discretion necessarily remains unimpaired.

In summary, Marbulk has identified no statute, regulation or policy that deprives the federal agencies of discretion with respect to any of the particular actions or inactions of which Marbulk complains. Thus, the agencies satisfy the first step of the *Gaubert* analysis. Because, as noted previously, Marbulk articulates no challenge the United States' position that the agencies' discretion is grounded in policy considerations, the sec-

---

5. Marbulk's own use of the term reflects that "shoreline" is mutually exclusive with the under-

water slope of the Basin. (Id.).

ond step of the *Gaubert* analysis is also satisfied.

Only a single claim merits further consideration. Marbulk alleges that NOAA published and distributed Chart 11376 inaccurately reflecting the dimensions, depth and condition of the Basin. Marbulk correctly notes that "[t]he Government must ... bear the burden of using due care in the preparation and dissemination of such charts and notices." *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 149 (5th Cir. 1971). However, *De Bardeleben Marine* does not insulate this duty from discretionary function immunity analysis.[6] The new Fifth Circuit has construed *De Bardeleben Marine* as an application of *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955),[7] and the Eleventh Circuit has held that, at least after *Gaubert, Indian Towing* does not support the proposition that, once the Government exercises its initial discretion to act, its decisions on *how* to act are beyond the reach of discretionary function immunity. *Ochran v. United States*, 117 F.3d 495, 505–06 (11th Cir.1997). In short, *De Bardeleben Marine* does not allow Marbulk to escape the consequences of the Court's discretionary function analysis.

## II. Spoliation.

The Corps removed the dredge pipe from the Basin (once it was located in the days following the allision) and deposited it on land just east of the Basin. There it remained for over a year, and there Marbulk's expert examined it in November 2001. In the summer of 2002, the dredge pipe was removed as salvage by Mike Hooks, Inc. and transported to Louisiana, where Marbulk's expert examined it again. (Doc. 252 at 13).

Marbulk argues that, had the Corps "preserved or made a proper record of the pipe at the time of its removal, it would be possible to identify the contractor responsible for the pipe with greater certainty." (Doc. 245 at 28). By Marbulk's own admission, however, it was not until after the pipe was removed to Louisiana—well over a year after it was deposited on land—that the potential for identification was compromised. (*Id.*). During that time, Marbulk had full knowledge and full access to the pipe and more than ample opportunity to accomplish whatever identification measures it desired.

Even were there evidence of spoliation, Marbulk has not supported its request for "[a] presumption of negligence" to arise as a result. "In this circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith. ... 'Mere negligence' in losing or destroying records is not enough for an adverse inference ...." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir.1997). Marbulk has not even attempted to demonstrate that the Corps' handling of the dredge pipe amounted to bad faith. If anything less than bad faith is insufficient to support an inference that the absent evidence would have been unfavorable to the custodial party, it is perforce insufficient to support a presumption of negligence. Finally, Marbulk has done nothing to establish that spoliation provides grounds for removing a federal agency's immunity from suit.

## CONCLUSION

For the reasons set forth above, the United States' motion for summary judgment is granted.[8]

---

6. *De Bardeleben Marine* incorrectly assumed that the Suits in Admiralty Act does not incorporate discretionary function immunity, *id.* at 146 n. 15, and so did not address the interplay between the duty and the doctrine.

7. *Southern Natural Gas Co. v. Pontchartrain Materials, Inc.*, 711 F.2d 1251, 1257 n. 8 (5th Cir. 1983).

8. The federal defendants are **ordered** to file and serve, on or before **March 26, 2004**, a statement identifying all remaining claims by or against them with respect to parties other than Marbulk.